United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 20, 2002**

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

**No. 01-40058**

---

**DELMA BANKS, JR.,**

Petitioner-Appellee-Cross-Appellant,

versus

**JANIE COCKRELL, DIRECTOR, TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
INSTITUTIONAL DIVISION,**

Respondent-Appellant-Cross-Appellee.

---

**Appeal from the United States District Court
for the Eastern District of Texas
(5:96-CV-353)**

---

Before HIGGINBOTHAM, BARKSDALE, and DENNIS, Circuit Judges.

PER CURIAM:[*]

For the capital murder conviction of Delma Banks, Jr., the State of Texas contests the partial habeas relief for the death sentence, the issues being: whether, in violation of ***Brady vs. Maryland***, 373 U.S. 83 (1963), the State withheld evidence that one of its witnesses was a paid police informant; whether, for the penalty phase, Banks' trial counsel was ineffective; and whether cumulative error is a basis for relief.

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Concerning the denial of habeas relief for his conviction, Banks seeks a certificate of appealability (COA), claiming: two other **Brady** violations; ineffective-assistance at the guilt phase; violation of **Swain v. Alabama**, 380 U.S. 202 (1965) (prosecutors' purposeful, systematic, discriminatory exclusion of venire members); and insufficient evidence.

**COA and HABEAS RELIEF DENIED; therefore, REVERSED and RENDERED.**

I.

The murder at issue occurred 22 years ago. Court proceedings since then have included the direct appeal, three state habeas petitions with evidentiary hearings, and an extensive evidentiary hearing for the federal petition at issue.

A.

On Monday morning, 15 April 1980, Richard Whitehead was found dead in a park near Nash, Texas, in Bowie County. *See* **Banks v. State**, 643 S.W.2d 129 (Tex. Crim. App. 1982), *cert. denied*, 464 U.S. 904 (1983). (Nash is near Texarkana.) He had been shot twice in the head and once in the upper back. Fisher, who lived near the park, reported being awakened by two gunshots the preceding Saturday, 12 April, at approximately 4:00 a.m.. And, Hicks and Bungardt, two female acquaintances of the victim, told investigators he was last seen alive the preceding Friday evening, 11 April, with a black male, whom they later identified as Banks.

2

As a result, Bowie County Deputy Sheriff Huff, the lead investigator, contacted police informant Farr and told him he would pay Farr $200 if he could obtain Banks' gun.  On 23 April, eight days after the victim was found, Farr, Banks, and Marcus Jefferson drove to Dallas to obtain a gun.

Bowie and Dallas County authorities monitored the trip and observed Farr's automobile, *driven by Banks*, stop at a south Dallas house; Banks go to the door and soon return; and the automobile drive away.  *Id.*  Officers stopped the automobile and seized a .22 caliber pistol;  it was not the murder weapon.

Banks was arrested.  Farr and Jefferson were detained but released the next morning.

In addition, that next morning, Officers returned to the south Dallas house and interviewed an occupant, Cook, who provided the following in a statement (April 1980 statement):  Banks stayed with him the weekend of 12 April (weekend of the murder);  Banks was driving an automobile matching the description of the victim's; during the weekend, Banks admitted to Cook he had killed a "white boy"; prior to Banks' returning to Texarkana after that 12 April weekend, he left the automobile and a .25 caliber pistol with Cook to discard; and Cook abandoned the automobile in west Dallas and sold the pistol to a neighbor.

3

Deputy Huff seized the pistol from the neighbor and submitted it for forensic testing.  The state forensics lab reported it was the murder weapon.

B.

At a 21 May 1980 examining trial, Deputy Huff summarized the State's case and recounted the events leading to Banks' arrest. The Deputy did not disclose, however, that payments were made to Farr.  He did disclose that Hicks and Bungardt reported the victim's automobile was having alternator problems (discussed *infra*).

The following day, Banks was indicted for capital murder.

C.

Prior to trial that Fall, the Bowie County District Attorney's office advised Cooksey, Banks' attorney, there would be no need to litigate discovery issues:  "We will, without the necessity of motions[,] provide you with all discovery to which you are entitled".  That August, Cooksey filed several standard pretrial motions, including for discovery; he did not seek a pre-trial hearing.

The first day of jury selection, Cooksey reported to the trial judge that he had not seen the State's witness list.  (It had been provided to him the previous week.)  Nor did Cooksey object when, in selecting the jury, the prosecution peremptorily struck the four qualified black potential jurors.  After jury selection, prior to

4

further proceedings, Cooksey complained the State had not provided a list of the prior convictions of the State's witnesses.

*Hicks and Bungardt testified* that Banks was with the victim on Friday, 11 April, and that the victim's automobile required a battery-jump in order to start.

*Fisher testified* he heard the two gunshots at approximately 4:00 a.m. on Saturday morning, 12 April.

*Farr testified*:  he accompanied Banks to Dallas to secure a pistol; they stopped at Cook's; and Banks reported the .22 caliber pistol he secured from Cook was not his, because his pistol was "in west Dallas".  Farr admitted using illegal drugs, but *denied* being a paid informant and speaking with any police officers.

*Cook testified*:  Banks arrived at approximately 8:30 a.m. on 12 April in a green Mustang and stayed with him for two days; Banks admitted to killing a white man in Texarkana; at Banks' request, Cook sold a pistol Banks had left with him and abandoned Banks' car.

*Cook's sister testified* she met Banks when he arrived with Cook in a green Mustang.

*Cook's neighbor confirmed* he purchased a .25 caliber pistol (later identified as the murder weapon) and other items from Cook approximately one week before authorities seized the pistol.

*Dr. DiMaio, the State's medical examiner, testified* the victim

5

died from three gunshot wounds but did not testify as to the time of death.

*Firearms examiner Jones testified* the bullets recovered from the victim and the crime scene had been fired from the pistol retrieved from Cook's neighbor.

*Banks did not present any evidence.* The jury found him guilty of capital murder. ***Id.*** at 132.

*At the penalty phase*, the State presented two witnesses: Farr and Vetrano Jefferson. Vetrano Jefferson was the brother of Banks' common-law wife and the older brother of Marcus Jefferson (who had accompanied Banks and Farr to Dallas eight days after the victim was found).

*Vetrano Jefferson testified* that, one week before the victim's death, Banks struck him (Vetrano Jefferson) with a pistol *and threatened to kill him*.

*Farr testified* he, Banks, and Marcus Jefferson drove to Dallas so that Banks could reclaim his pistol to commit armed robberies and take care of any trouble that might arise during one.

*As part of Banks' evidence*, two witnesses testified in order to discredit Farr: *Kelley testified* he recently drove Farr to several doctors' offices to fill false prescriptions; and, a *former Arkansas police officer testified* Farr served as a paid informant in that State and was known to be unreliable.

6

*Banks' parents and several acquaintances testified* that Banks was a respectful, churchgoing young man.

And, *Banks testified*. Among other things, he stated it was his idea to obtain a gun so that Farr could commit an armed robbery. And, he admitted striking Vetrano Jefferson with a gun and threatening to kill him.

In October 1980, after the jury found the requisite special issues, the judge imposed the death penalty.

### D.

In 1982, on direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence. **Banks v. State**, 643 S.W.2d 129. The Supreme Court of the United States denied *certiorari* in 1983. **Banks v. Texas**, 464 U.S. 904.

### E.

Banks filed three state habeas petitions.

### 1.

Banks' first raised, *inter alia*, a jury discrimination claim based on **Swain**, 380 U.S. 202, and a sufficiency of the evidence claim with regard to the second special sentencing issue — future dangerousness. After an evidentiary hearing, at which Banks offered no live testimony, the trial court recommended denial on the merits; the Court of Criminal Appeals accepted this recommendation. **Ex parte Banks**, No. 13,568-01 (Tex. Crim. App. 1984) (unpublished).

2.

Banks' second petition, *inter alia*, again raised the sufficiency claim. After another evidentiary hearing, the petition was again rejected on the merits. **Ex parte Banks**, 769 S.W.2d 539, 540 (Tex. Crim. App. 1989).

3.

Banks' third petition presented, *inter alia*, each claim raised in this federal proceeding: ineffective-assistance; systematic exclusion of blacks; withholding material impeachment evidence on Cook and Farr; and insufficient evidence to support future dangerousness. The trial court did not conduct an evidentiary hearing and recommended denial.

The Court of Criminal Appeals remanded for an evidentiary hearing on the **Swain** and juror bias claims (the latter is not at issue). **Ex parte Banks**, No. 13,568-03 (Tex. Crim. App. 3 Mar. 1993) (unpublished). Following the hearing, and concerning the **Swain** claim, the trial court concluded: the evidence established a *prima facie* case of discrimination; it was rebutted, however, by the State's non-discriminatory reasons for the strikes. The Court of Criminal Appeals denied relief, based on the trial court's findings and conclusions. **Ex parte Banks**, No. 13,568-03 (Tex. Crim. App. 11 Jan. 1996) (unpublished).

F.

Banks filed his federal petition after contacting Farr and Cook. Farr revealed he had been a paid informant. And, Cook stated: significant portions of his testimony were false and given under pressure from authorities; Deputy Huff and others assured him that, in exchange for favorable testimony, a pending charge in Dallas County would be dismissed; and his testimony had been rehearsed on several occasions.

1.

On the basis of several affidavits, the magistrate judge granted Banks limited discovery and an evidentiary hearing on his ineffective-assistance, **Brady**, and **Swain** claims.

As of the hearing, Farr resided in California and feared returning to Texarkana because of his poor health and prior informant activities. Therefore, Banks submitted Farr's affidavit. The State did not seek to depose Farr and limited its objection pursuant to **Keeney v. Tamayo-Reyes**, 504 U.S. 1 (1992) (if failed to factually develop claim during state court proceedings, petitioner must establish cause and prejudice to be entitled to federal evidentiary hearing).

Farr's affidavit stated: he was paid $200 by Deputy Huff "to set Delma [Banks] up"; he convinced Banks that he (Farr) wanted a gun to rob a pharmacy for drugs; and it was Farr's idea to drive to Dallas to retrieve Banks' gun. At the federal hearing, Deputy Huff

9

confirmed that Farr had been a paid informant. And, Marcus Jefferson, who accompanied Banks and Farr to Dallas, testified Farr initiated conversations with Banks about securing a gun so that Farr could commit robberies.

Pursuant to the discovery order, the Bowie County District Attorney's office disclosed an undated, 74-page transcript of Cook's September 1980 pretrial interview, conducted by Bowie County law enforcement officers and prosecutors. (This transcript is the subject of a *Brady* claim COA request, discussed in part II.B.1.a.) At the evidentiary hearing, Assistant District Attorney (ADA) Elliot confirmed: at trial, his co-counsel, Raffaelli (the District Attorney during Banks' trial, who died prior to the evidentiary hearing), was in possession of the transcript and several pages of handwritten notes; prior to trial, they had *not* been disclosed to Banks. Only Cook's April 1980 statement, provided approximately two weeks after the murder, had been disclosed at the conclusion of Cook's trial testimony on re-direct.

Concerning the alleged deal for Cook's testimony (the subject of a *Brady* claim COA request, discussed in part II.B.1.b.), ADA Elliot testified: he did not arrange one, but it was possible Raffaelli did so without his knowledge; Deputy Huff and another investigator had contact with Dallas authorities that he (Elliot) was not privy to, but Deputy Huff had no authority to make a deal; and, following Banks' trial, he (Elliot) accompanied Deputy Huff

10

and Cook to Dallas and told an ADA there that, in a capital murder case, Cook gave helpful testimony for the prosecution. Deputy Huff similarly testified that, although he discussed the pending arson charges with Cook, he did not tell Cook that, in exchange for favorable testimony, they would be dismissed.

Cook's evidentiary hearing testimony sharply contradicted the State's. Cook claimed: when authorities arrived at his home on 24 April 1980, Deputy Huff threatened to charge him with being an accessory to murder if he failed to cooperate; he gave a statement (April 1980 statement) that was, in many respects, incomplete and untruthful; he was fearful of Deputy Huff throughout the investigation and trial and continued to fear him; a month prior to Banks' trial, habitual offender papers were filed in the pending case (arson) which would have significantly lengthened his (Cook's) maximum sentence; he understood Deputy Huff's remarks concerning cooperation to mean he needed to testify consistent with his April 1980 statement; while he was waiting to testify, Deputy Huff transported him to his wife's hotel to have conjugal visits (Cook's former wife gave consistent testimony); portions of his trial testimony were untruthful; and the day Deputy Huff and Elliot returned him to Dallas, the arson charges were dismissed.

Cook's sister, Carol Cook, testified: Deputy Huff threatened to "lock [her] brother up for the rest of his life" if she refused to testify at Banks' trial; Deputy Huff directed her to change her

11

testimony concerning the automobile she saw Banks driving during the 12 April weekend; although she was sure the automobile was *red*, Deputy Huff insisted it was *green*; and although she initially told the jury the automobile was *red*, she corrected herself and said it was *green*.

Regarding ineffective-assistance, witnesses testified concerning the time-of-death evidence, Cooksey's trial preparedness, and the defense function in capital trials.

Concerning time of death, although Fisher's trial testimony was that he heard what sounded like gunshots at 4:00 a.m. on Saturday, 12 April, his federal testimony was: he knew nothing about guns; the noises could have been firecrackers, car backfires, or rifle shots; and the noises could have occurred between 3:00 and 5:00 a.m. Dr. Riddick, a medical examiner for the State of Alabama, testified that several factors led him to conclude the victim died late on the evening of 12 April (Saturday) or early Sunday morning, 13 April. He conceded, however, that, consistent with the State's theory, including the effect of the weather, it was possible the victim was killed around 4:00 a.m. on Saturday, 12 April.

Concerning assistance of counsel, Banks' parents testified that, prior to trial, Cooksey met with them only briefly, with meetings lasting "no longer than 10 to 15 minutes". Mrs. Banks testified Cooksey asked her to testify Banks was at home with her

on Friday evening, 11 April; she refused. Although both parents had testified during the penalty phase, Cooksey had not spoken with them about the information he wanted communicated to the jury.

Kelley, who testified concerning Farr's bogus prescription scheme: was unaware that Cooksey planned to call him as a witness; had several drinks earlier on the morning of his trial testimony; and "was drunk" when he testified.

Vetrano Jefferson, who testified at trial for the State, testified: his fight with Banks he described at trial began because he (Jefferson) was drunk and was threatening his sister (Banks' common law wife); Banks defended her; Jefferson started the fight; and he never spoke with Banks' counsel, but would have been willing to do so.

Dr. Cunningham, an expert in forensic psychology, testified he conducted a thorough psychological evaluation of Banks (including nine hours with Banks, interviews with his family, and review of the trial transcript and his school, medical, and prison records) and concluded that, at the time of trial, there was little likelihood of additional acts of violence from Banks.

Goldstein testified Cooksey was ineffective in: pretrial investigation, cross-examination of State's witnesses, presentation of penalty phase witnesses, and failing to utilize a mental health expert.

In rebuttal, the State called Waters, hired by Cooksey as an investigator for Banks' trial. Waters testified he: interviewed

13

a number of witnesses, but could not recall their names; visited and photographed the crime scene; and did *not* believe Banks' claim that he hitchhiked to Dallas, because, for example, Banks could not describe the vehicle he rode in.

## 2.

The magistrate judge recommended habeas relief be granted in part (sentence) and denied in part (conviction). The recommended relief was based on the State's failure to disclose Farr's paid informant status and ineffective-assistance at the penalty phase. ***Banks v. Johnson,*** No. 5:96-CV-353 (E.D. Tex. 11 May 2000) (unpublished) **(*Banks-USDC*).**

## 3.

With minor modifications, the district court accepted the recommendations. ***Banks v. Johnson,*** No. 5:96-CV-353 (E.D. Tex. 18 Aug. 2000) (unpublished) **(*Banks-USDC II*).** The district court later denied Banks' Rule 59 motion to modify the judgment. It also *denied* Banks a COA.

## II.

Banks' third state habeas petition was denied approximately 15 years after his conviction. Because his federal petition was filed shortly before the 1996 effective date of the Antiterrorism and Effective Death Penalty Act (AEDPA), it is not applicable to the claims for which habeas relief was granted. *See **Lindh v. Murphy**,*

521 U.S. 320, 336-37 (1997).  But, as discussed in part II. B., it is applicable to Banks' COA requests.

A.

Relief was granted on two bases: (1) information being withheld in violation of *Brady*, 373 U.S. 83; and (2) ineffective-assistance at the penalty phase.

Under pre-AEDPA law, we "generally accord a presumption of correctness to any state court factual findings". *Mann v. Scott*, 41 F.3d 968, 973 (5th Cir. 1994), *cert. denied*, 514 U.S. 1117 (1995).  In addition, we "review the district court's findings of fact for clear error, but decide issues of law *de novo*".  *Id*.

1.

Relief was granted under *Brady* because the State failed to disclose Farr, a penalty phase witness, was a paid police informant. *Banks-USDC*, at 44.  This claim was not raised in either the first or second state petitions.  In his third, Banks claimed the State violated *Brady* by failing to disclose "information that would have revealed ... Farr as a police informant and ... Banks' arrest as a 'set-up'".  The trial court's denial recommendation did not specifically address this *Brady* claim; and the Court of Criminal Appeals, after remanding for an evidentiary hearing solely on Banks' unrelated *Swain* and juror bias claims, accepted the trial court's recommendation and denied relief.  *Ex parte Banks*, No. 13,568-03 (Tex. Crim. App. 11 Jan. 1996) (unpublished).

15

To establish a ***Brady*** claim, Banks must prove:  (1) the "evidence was suppressed"; (2) it "was favorable to the accused"; and (3) it "was material either to guilt or punishment".  ***United States v. Ellender***, 947 F.2d 748, 756 (5th Cir. 1991).  The district court ruled:  the substance of Farr's penalty-phase testimony was that he, Banks, and Marcus Jefferson traveled to Dallas to retrieve Banks' gun so that Banks could commit armed robberies; and the purpose of that testimony was to demonstrate future dangerousness.  ***Banks-USDC,*** at 43-44.

In holding ***Brady*** had been violated, the district court relied on Deputy Huff's testimony at the federal hearing that Farr was a paid informant.  ***Id***. at 43.  Also in the record are two affidavits in which Farr admits being a paid informant.

The State maintains:  that the affidavits and Farr's testimony are unexhausted, and the federal hearing at which Deputy Huff testified was improperly granted; and that, alternatively, the ***Brady*** claim fails on the merits.

### a.

The procedural issues are:  whether the federal hearing should not have been held; and whether the evidence relied on by the district court is unexhausted.

16

The State contends Banks was not entitled to the hearing in the light of his failure, during the state proceedings, to develop the factual bases of his *Brady* claim. A petitioner is "entitled to [a federal] evidentiary hearing *if* he can show cause for his failure to develop the facts in state-court proceedings and actual prejudice resulting from that failure". *Keeney*, 504 U.S. at 11 (emphasis added). An exception to this cause-and-prejudice requirement exists if a petitioner "can show that a fundamental miscarriage of justice would result from failure to hold a federal evidentiary hearing". *Id*. at 12.

With regard to Banks' *Brady* claim, however, the order establishing the issues to be considered at the federal hearing never mentions either this cause-and-prejudice requirement or this miscarriage-of-justice exception. Nevertheless, the district court ordered the hearing based on Banks' offering proof that "he could not have had the information regarding this issue prior to any of his three state evidentiary hearings" because he asked the state court for aid in developing Cook's testimony, and the "state court never acted on [Banks'] request for assistance". In addition, the district court ruled Banks had "demonstrated ... he did not have a full and fair opportunity to present his evidence on [the *Brady*] issue to the state court, primarily because [Farr and

17

Deputy Huff] did not come forward until *after* the state court evidentiary hearings".  (Emphasis added.)

Concerning the witnesses' not coming forward, the State contends there was no evidence this was due to its interference. *See* **Johnson v. Puckett**, 176 F.3d 809, 816 (5th Cir. 1999) ("a showing of 'interference by officials' is sufficient to show cause for a procedural default").  The State next contends that the state courts did not prevent Banks from developing the **Brady** claim. Instead, according to the State, there is nothing in the record that demonstrates Banks was prevented from exploring this issue during the state habeas proceedings.  As for the district court's observation that the state courts did not respond to Banks' request for investigative-assistance, the State contends such requests were limited to assistance to investigate whether there had been a failure to disclose **Brady** information *regarding Cook, not Farr.*

Banks does not specifically address the challenge to holding a federal evidentiary hearing.  Instead, he responds to the exhaustion contention, discussed *infra*.

As for no evidence being presented at the state evidentiary hearing because the state court never acted on Banks' request for assistance, Banks' request was limited, as acknowledged by the district court, to "investigative assistance *regarding Cook's testimony*", not Farr's.  (Emphasis added.)  Banks had stated he "need[ed] the aid of an investigator in order to develop fully his

18

allegation that the Bowie County District Attorney's office had not disclosed that a favorable deal had been arranged for ... *Cook*, the State's chief witness, in exchange for his testimony...." (Emphasis added.) (Again, this alleged deal is the subject of a *Brady* claim COA request, discussed in part II.B.1.b.)

Obviously, the state court's refusal concerning Cook is of no relevance to the *Brady* claim regarding Farr.  Accordingly, not being provided investigative assistance is not cause for not developing this *Brady* issue in state court, in the light of Banks' never asking for assistance *with regard to Farr*.

As for witnesses not coming forward until after the state court evidentiary hearing, Banks has not demonstrated that he attempted, even if unsuccessfully, to explore this issue, or any other issue, with those witnesses.  Farr states in one of his affidavits:  "I would not have revealed the information in this declaration to [Banks' representatives], or to anyone else, before I elected to do so *in the fall of 1996*".  (Emphasis added; Banks' third — and final — state habeas request was denied much earlier, in January 1996.)  Even accepting Farr's statement as true, it does not justify Banks' not attempting to speak with Farr prior to the conclusion of the (three) State habeas proceedings.

Accordingly, Banks has not shown cause for not attempting in state court to factually develop this *Brady* issue.  In addition, neither the district court nor Banks in this appeal attempts to

19

demonstrate the applicability of the fundamental-miscarriage-of-justice exception. Accordingly, the district court erroneously granted an evidentiary hearing regarding this **Brady** issue.

As a result, habeas relief cannot be granted based on the evidence presented at the federal hearing: Deputy Huff's testimony that Banks was a paid informant. **Banks-USDC**, at 42-44. The district court's holding, however, is predicated upon that testimony. Without it, the **Brady** claim must fail. It is true that, in Farr's affidavits presented to the district court, he admits his paid informant status. But, for the reasons stated *infra*, that evidence is not exhausted and, as a result, cannot establish a **Brady** claim.

ii.

Assuming *arguendo* the evidentiary hearing was granted properly for this **Brady** claim, next at issue is the State's contention that Deputy Huff's testimony, as well as Farr's above-referenced affidavits, were not exhausted. As a prerequisite to federal habeas relief, a petitioner must exhaust "the remedies available in the courts of the State". 28 U.S.C. § 2254(b) (1994). Such remedies are not exhausted where the petitioner "presents material additional evidentiary support to the federal court that was not presented to the state court". **Graham v. Johnson**, 94 F.3d 958, 968 (5th Cir. 1996). "[N]ew factual allegations in support of a previously asserted legal theory" must also be exhausted, even

20

though such "factual allegations came into existence after state habeas relief had been denied". *Joyner v. King*, 786 F.2d 1317, 1320 (5th Cir.), *cert. denied*, 479 U.S. 1010 (1986). "There is, however, a 'cause and prejudice' exception to the bar for failure to exhaust." *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir.), *cert. denied*, 122 S. Ct. 329 (2001).

Again, Banks' third (final) state petition was denied in January 1996. Neither of Farr's affidavits — dated 4 November 1996 and 21 May 1999 — was presented in state court. A district court should not consider an affidavit that was not offered to the state court where no cause for failure to exhaust has been shown. *Woods v. Johnson*, 75 F.3d 1017, 1029 n.16 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996); *see Hogue v. Johnson*, 131 F.3d 466, 505 (5th Cir. 1997) (holding federal court should not consider affidavits not presented to state court), *cert. denied*, 523 U.S. 1014 (1998).

As for cause, in his brief here, Banks contends:

> *[Banks] pleaded that Farr was an informant in his third state habeas proceeding*. Candor required the state to respond truthfully and admit his true status. Instead, [the attorney] who was then representing the state's interest, *ignored the claim and made no response*. It was only after this matter was filed in federal court that ... Banks located and gained access to ... Farr, who for the first time revealed his informant status in this matter.

(Emphasis added.) In this light, it is clear that, at the time of Banks' third state habeas proceeding, he *believed* Farr had been a

21

paid informant. Nevertheless, Banks offers no reason why he did not attempt to locate Farr and ascertain his true status. If Banks had sought Farr's testimony, and Farr had been uncooperative, then, arguably, Banks would have shown cause. Instead, because it appears he made no such effort, the "cause" for Banks' failure to obtain Farr's information was Banks' lack of diligence.

Along this line, Banks maintains the State should have responded to his state habeas Farr-was-an-informant contention. But, when the State did not respond, this should have prompted him to further investigate this claim, *i.e.,* speak with Farr, rather than do nothing.

Concerning Deputy Huff's federal testimony that Farr was a paid informant, and as for cause, Banks contends: "[I]t was only because of the [federal] ... hearing that [he] had the opportunity to put [the State's attorney] and [Deputy] Huff under oath and directly inquire about ... Farr's true status". This does not demonstrate cause. As of his third state petition, Banks believed Farr had been an informant. Accordingly, Banks should have at least attempted to interview the investigating officers, such as Deputy Huff, to ascertain Farr's status.

Therefore, neither Farr's affidavits nor Deputy Huff's testimony are exhausted, and Banks has not shown cause for his failure to do so. Federalism concerns demand that state courts be given an opportunity to consider a claim on the same evidence as do

22

federal courts.  Because this evidence is procedurally barred, and is the only evidence Banks offers in support of this **Brady** claim, it fails.

b.

Assuming both that the federal hearing concerning this claim was proper and that the evidence was exhausted, at issue are the merits of the **Brady** claim.  Again, Banks must satisfy each of **Brady's** three prongs:  the State withheld evidence; it was favorable to him; and it was material.  *See* **Ellender**, 947 F.2d at 756.

i.

The State maintains Banks has not presented evidence that it withheld Farr's status.  Noticeably absent from the record, according to the State, is any statement from Banks' trial counsel (Cooksey) that he did not know Farr's status.  The State raised this issue in district court, asserting in its summary judgment motion:  "defense counsel [Cooksey] was obviously aware of evidence that Farr was a police informant"; and "Banks has failed to allege or prove exactly what evidence the prosecution purportedly knew about that the defense did not".  The district court disagreed: "At no time did the State correct Farr's erroneous [trial] testimony [that he was not paid for his testimony] or announce Farr's paid informant status".  **Banks-USDC**, at 44.

23

Banks responds that the evidence does demonstrate Farr's informant identity was never provided to him. According to Banks: "Although the *Brady* doctrine required the trial prosecutors to formally advise counsel of Farr's status, there is no pleading or oral reference to Farr's status as an informant anywhere in the trial record".

Banks also asserts that, at the pre-indictment examining trial, Deputy Huff refused to disclose the informant's identity. And, at trial, when Banks' counsel asked Farr whether he was paid for his testimony, Farr denied he was. According to Banks, given his counsel's strategy to discredit Farr, had he known he was a paid informant, he surely would have challenged Farr's response. Finally, Banks points to Deputy Huff's inquiry to Banks' counsel at the federal hearing on whether it was permissible to identify Farr as an informant:

> Q.   In this particular case, you received the aid from an informant, did you not?
>
> A    Yes, sir.
>
> Q    And who was that?
>
> A    His name is Robert Farr. I don't know if it's procedurally regular –
>
> Q    We've inquired. Mr. Farr has no problem with revealing his identity.
>
> A    Robert Farr.

24

The State responds that it had no duty to disclose Farr's informant status or that he was paid; and that Banks was not diligent in seeking disclosure.

In the light of Banks' failure to exhaust the evidence supporting this **Brady** claim, as well as our holding, *infra*, that Farr's status was not material to the jury's penalty phase finding, we need not decide whether the State had a duty to disclose Farr was a paid informant and, if so, whether it did so. Instead, we will *assume* this information was *withheld*.

ii.

At issue, therefore, is whether the withheld evidence was favorable to Banks. In the report and recommendation, the magistrate judge stated that Farr testified that he, Banks, and Marcus Jefferson "traveled to Dallas to retrieve [Banks'] gun so that *Banks* could commit several armed robberies". **Banks-USDC**, at 43-44 (emphasis added). The State notes Farr instead testified: "*We* were going to pull some robberies on the way back [to Texarkana]". (Emphasis added.)

Farr states in his affidavits that he never intended to commit an armed robbery; that he only told Banks that so that he would retrieve Banks' gun. According to the State, the jury

> was presented with a scenario in which two people were acting together for an illegal purpose. It would hardly be favorable to Banks' case for the jury to be told that Farr only made up the story about the robbery so that Banks would ... get his gun. This set of

25

> facts would have had only one of the two men –
> Banks – believing the gun would be used in an
> armed robbery.

Banks does not respond to this contention, focusing instead on the third **Brady** prong — materiality. In any event, the State's contention misses the mark. The withheld evidence was Farr's paid informant status. Such information, obviously, has a bearing on his credibility; Farr's being a paid informant would certainly be favorable to Banks in attacking Farr's testimony. Accordingly, Banks has satisfied the second **Brady** prong.

### iii.

For the final **Brady** prong, evidence is

> *material* only if there is a reasonable
> probability that, had the evidence been
> disclosed to the defense, the result of the
> proceeding would have been different. A
> reasonable probability is a probability
> sufficient to undermine confidence in the
> outcome.

**Ellender**, 947 F.2d at 756 (emphasis added; internal quotation marks omitted). The State contends Farr's status is not material because his testimony was corroborated by other witnesses and the information's impeachment value would have been cumulative.

During the penalty phase, Farr testified that he, Banks, and Marcus Jefferson traveled to Dallas to "pick up a pistol". When they arrived at Cook's house, Banks went to the front porch and returned with a gun that was not his, stating Cook had given his (Banks') gun to a woman in west Dallas. As stated, concerning

26

their intent, Farr testified: "We were going to pull some robberies on the way back [to Texarkana]".

According to the State, Marcus Jefferson's guilt phase testimony was consistent with Farr's. Jefferson testified: when he, Farr and Banks reached Dallas, they drove around looking for a house; when they reached it, Banks went to the front porch, returned with a pistol, and stated that the person who had given him that pistol, Cook, did not have his (Banks') gun because he had given it to someone else.

The State also relies on Cook's trial testimony: while Banks was staying in his house one day after the murder, he (Cook) took Banks' gun and sold it; Banks later came to his house and told him he needed a pistol; and Banks asked him where his (Banks') was.

The State also contends that Banks' own trial testimony corroborates many of Farr's statements. During the penalty phase, Banks testified: Farr planned to commit "some robberies"; and it was his (Banks') idea "to go get the gun". On cross-examination, Banks testified that, when he arrived at Cook's house, Cook did not have Banks' gun and gave him (Banks) another. Ultimately, Banks *admitted* he was "going to supply [Farr] the means and possible death weapon in an armed robbery".

In its second contention concerning materiality, the State maintains that the impeachment value of Farr's paid informant status is low because of other impeachment evidence used against

27

him.  During Farr's penalty phase cross-examination, he denied: (1) going to Arkansas the previous week to obtain false prescriptions and getting into an altercation with a doctor who refused to provide him with one; (2) being a "snitch" for Owens, an Arkansas narcotics officer; and (3) that his wife shot him.

During the penalty phase, however, defense witness Kelly contradicted Farr's denial of an altercation with a doctor in Arkansas.  According to Kelly, when he went into the hospital where Farr was located, the doctor and Farr were "fussing" and the doctor told Farr "to get his ass out of there".  Kelly also testified that, after unsuccessfully attempting to obtain prescription drugs from other hospitals in Arkansas, Farr stated "he was going to get what he was after [prescription drugs] before we got back to Texarkana".

The above-referenced Arkansas officer, Owens, testified for the defense at the penalty phase and contradicted Farr's assertion that he never was an informant for him and that he had not been shot by his (Farr's) wife.  Owens testified he had used Farr as an informant once or twice and that, because his "information was not correct", he no longer used him.

Banks does not respond to these assertions by the State. Instead, Banks' argument is two-fold.  First, he contends:

> As the state had little other evidence to demonstrate that [he] would be a danger in the future, the result at the penalty phase likely would have been different had the jury known that Farr had every reason to testify as he

28

did to protect his business relationship with
law enforcement and to avoid prosecution.

Second, Banks maintains that, because the prosecution failed to correct Farr's untruthful testimony during the guilt phase, the standard for materiality is less onerous. The referenced testimony occurred when, on questioning by Banks' attorney, Farr denied "ever tak[ing] any money from some police officers".

For this second contention, Banks relies upon *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993), which held that, "if the prosecutor has knowingly used perjured testimony or false evidence, the standard is considerably less onerous:  the conviction 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict'". (Quoting *United States v. Bagley*, 478 U.S. 667, 679 n.9 (1985) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959) (Fourteenth Amendment violation if "the State, although not soliciting false evidence, allows it to go uncorrected when it appears"))); *see also Giglio v. United States*, 405 U.S. 150, 153-55 (applying *Napue* standard where the Government did not correct a witness' false testimony concerning an agreement not to prosecute in exchange for his testimony).

*Kirkpatrick*, however, does not hold that the *Brady* materiality standard is lessened because of false testimony. Instead, *Kirkland* delineates the *Brady* materiality standard from that for a

29

*Giglio/Napue* claim. 992 F.2d at 497 ("We observe that different standards of materiality apply to *Brady* claims and claims that the prosecution has knowingly used perjured testimony or false evidence."). In short, *Kirkpatrick* makes clear that a *Brady* claim and a *Giglio/Napue* claim are separate and distinct. *E.g.,* *Barrientes v. Johnson*, 221 F.3d 741, 752-53 (5th Cir. 2000) (analyzing *Brady* claim separately from *Giglio* claim), *cert. dismissed*, 531 U.S. 1134 (2001). Accordingly, whether the prosecution failed to correct Farr's testimony is irrelevant to Banks' *Brady* claim and its materiality standard.

To the extent Banks attempts to establish a *Giglio/Napue* claim, the State maintains it must fail for several reasons: Banks never raised it in his federal petition; the district court did not grant relief based on it; and, even if Banks had presented it, it should be denied on the merits.

No *Giglio/Napue* claim is presented in Banks' federal petition. He does, however, make such an assertion in his federal post-hearing brief and in his proposed findings and conclusions. We need not decide whether Banks sufficiently raised this claim; the district court granted relief under *Brady*, not *Giglio/Napue*. It did recognize that, at "no time did the State correct Farr's erroneous testimony or announce Farr's paid informant status"; it granted relief, however, on the basis of *withheld* impeachment evidence. *Banks-USDC*, at 44.

30

Assuming Banks raised a *Giglio/Napue* claim in district court, we cannot consider it, because Banks does not seek a COA based on the district court's not granting relief on this basis. Furthermore, again assuming the federal petition included a *Giglio/Napue* claim, Banks' first and second state habeas petitions did not. In his third petition, while he does cite *Giglio*, he does so only in connection with the *Brady* claim *concerning Cook*, *not Robert Farr*:

> As extensively detailed elsewhere in this Petition, the prosecutors concealed promises of leniency and favorable treatment made to key State's witness Cook. Had this evidence been disclosed to the defense, as required by *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963), the jury likely would have rejected Cook's testimony and acquitted Mr. Banks.

In contrast, in Banks' third state petition, in the section presenting his *Brady* claim concerning *Farr's* paid informant status, there is no mention of a *Giglio/Napue* violation.

> To exhaust, a petitioner must have fairly presented the substance of his claim to the state courts. It is not enough that all the facts necessary to support the federal claim were before the state courts.... Indeed, where petitioner advances in federal court an argument based on a legal theory distinct from that relied upon in the state court, he fails to satisfy the exhaustion requirement.

*Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (internal quotation marks and citations omitted).

31

Accordingly, because Banks seeks relief on a legal theory distinct from that relied on in state court, any *Giglio/Napue* claim is unexhausted. Therefore, under the materiality standard for **Brady**, *not Giglio/Napue*, we must determine whether there is a reasonable probability that, had the jury been informed of Farr's status, it would not have assessed the death penalty.

As detailed above, much of Farr's penalty phase testimony was corroborated, even by Banks. Obviously, although such testimony was crucial to the State's position on future dangerousness, Farr's paid informant status would not have *directly* contradicted his testimony regarding Banks' intent. Instead, evidence of his true status would only have directly impeached his testimony that he was not an informant.

Furthermore, even assuming it was not Banks' intent to actually participate in the planned robberies, it was certainly his intent to provide Farr with a weapon to do so. Neither Farr's affidavits nor Deputy Huff's testimony disputes this.

And, to the extent Farr's informant status would have been useful as other impeachment evidence, Farr had already been impeached on three bases: that he did not get into an altercation regarding false prescriptions; that he was not an informant for Arkansas law enforcement; and that he had not been shot by his wife.

32

Accordingly, Farr's paid informant status, when considered against the other impeachment evidence about him, and the fact that much of his testimony concerning the trip to Dallas to retrieve Banks' pistol was corroborated, does *not* present a reasonable probability that the jury would have found differently concerning Banks' future dangerousness. *See **Drew v. Collins***, 964 F.2d 411, 419 (5th Cir. 1992) (holding evidence of an "incremental impeachment value" not material), *cert. denied*, 509 U.S. 925 (1993). Therefore, the district court erroneously granted relief based on **Brady**.

2.

Relief was also granted on Banks' ineffective-assistance claim for the penalty phase. He did not raise it in his first state petition; in his second, he claimed only *appellate counsel* was ineffective. In his third state petition, however, he claimed *trial counsel* was ineffective for both phases. In recommending denial, the state trial court stated: Banks received effective assistance at all trial stages; and counsel adequately and effectively investigated "matters relevant to both the guilt/innocence and punishment phases". Again, after remanding for an evidentiary hearing concerning Banks' **Swain** and juror bias claims, the Court of Criminal Appeals accepted the trial court's recommendation and denied habeas relief. **Ex parte Banks**, No. 13,568-03 (Tex. Crim. App. 11 Jan. 1996) (unpublished).

33

To prevail on ineffective-assistance, Banks must prove deficient-performance and resulting prejudice. ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). Performance is deficient when the representation falls "below an objective standard of reasonableness". ***Id***. at 688.

Prejudice occurs if counsel's errors "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable". ***Id***. at 687. Accordingly, Banks must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". ***Id***. at 694. "When a defendant *challenges a death sentence* ..., the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death". ***Id***. at 695 (emphasis added).

The district court held counsel's performance "deficient [because he] fail[ed] to investigate or prepare for the punishment phase, despite ... available mitigating evidence relating to Banks's background" and "fail[ed] to interview or prepare the witnesses he ... called and examined" at that phase. ***Banks-USDC***, at 24. Concerning prejudice, the court held there was "a reasonable probability that[,] but for the errors and omissions of trial counsel at the punishment phase, *combined with the State's failure to disclose Farr as a paid informant*, the outcome of

34

Banks's punishment phase would have been different". *Id*. at 24-25 (emphasis added; cumulation of error discussed *infra*).

The district court first found deficient-performance because counsel did not "attempt[] to obtain a social history from Banks or his family". *Id*. at 22. In addition, it found: counsel never questioned Banks' parents about his childhood; never informed them they would be called to testify at the penalty phase; and waited until the guilty verdict was returned to instruct Banks' mother to "gather witnesses for the punishment phase, which began the following day". *Id*.

The district court also based deficient-performance on Dr. Cunningham's testimony at the federal hearing; the court stated: "Banks's father abused alcohol and subjected Banks to repeated incidents of brutality and harsh discipline"; as a child, "Banks witnessed many episodes of cruelty directed at his mother"; and "Banks ... had no history of violence or alcohol abuse and seemed to possess a self-control that would suggest no particular risk of future violence". *Id*. at 23. According to the district court, counsel never explored any of these issues and never presented this evidence to the jury. *Id*.

The district court also found that, prior to trial, counsel made no attempt to interview Vetrano Jefferson, the State witness. *Id*. at 22. As noted, he was the second of the two penalty phase witnesses used to establish future dangerousness; he testified

35

Banks had hit him with a gun *and threatened to kill him*.

According to the district court, if counsel had interviewed Vetrano Jefferson, he would have known that

> Jefferson, not Banks, was the aggressor in the fight between the two men which occurred the proceeding April [the month of the murder]. The trial testimony of Jefferson and the prosecutor's argument left the clear impression that Banks was the aggressor.

*Id*. at 23.

a.

First at issue is whether counsel was ineffective for failing to obtain Banks' social history and to investigate mitigating psychological evidence.

i.

The two failures are related. Obviously, to determine whether expert assistance was needed, counsel needed to know the circumstances of Banks' past. For example, was he abused; did he have mental deficiencies? Failure to ask these and similar questions of his parents and others, a failure the State does not dispute, falls below an objective standard of reasonableness. Banks has demonstrated deficient-performance.

ii.

Regarding prejudice, in his brief here, Banks relies on Dr. Cunningham's testimony:

> Dr. Cunningham's testimony showed that [Banks' father's] chronic abuse of alcohol nearly tore his family apart, caused ... Banks to endure

36

> repeated incidents of undeserved brutality and harsh discipline, and to witness many instances of extreme cruelty directed at his mother and siblings.

Dr. Cunningham testified: (1) Banks was physically and mentally abused by his father; (2) he witnessed his father's abuse of his mother; (3) his father discharged firearms in the house; (4) his father was an alcoholic; (5) Banks had a learning disability; (6) he suffered from a chronic skin disease; and (7) there was a low risk Banks would commit future acts of violence.

The State maintains Dr. Cunningham's testimony is not exhausted, because it was not presented in the state proceedings. There, Banks submitted the affidavits of Dr. Pina, which stated: his observations indicated Banks suffered brain damage; and, ultimately, Banks did "not understand much of what was happening at his trial, [and] he also did not understand much of what his lawyer was saying". In his amended affidavit, Dr. Pina discussed, *inter alia*, Banks' skin condition and his conclusion that Banks was "beaten and terrorized by his alcoholic father; at least one such beating involved young Delma's being tied to a tree and whipped". He also stated that "some of the[] features of ... Banks' psychological profile accurately would have predicted that he would prove a 'safe,' nonviolent inmate during his present incarceration".

Banks does not address the exhaustion issue. He also stated that "some of the[] features of ... Banks' psychological profile

37

accurately would have predicted that he would prove a 'safe,' nonviolent inmate during his present incarceration".

He fails to show cause for not presenting Dr. Cunningham's testimony to the state courts. This testimony is not exhausted; it is a significant expansion of the facts and opinions presented in state court through Dr. Pina's affidavits. *See* **Beazley**, 242 F.3d at 264. Accordingly, the only exhausted evidence for this claim is through Dr. Pina's affidavits.

As discussed *supra*, those affidavits addressed, *inter alia*, Banks' father's "beating" and "terrorizing" him, including the tying-whipping incident. Dr. Pina concluded: "[These] experiences alone would be enough to account for a large part of Mr. Banks' psychological impairment". As for Banks' skin condition, Dr. Pina concluded: "[This] illness, compounding the trouble in his parents' marriage from his father's alcoholism, impaired the development of normal and supportive bonding relationships between [Banks] and his mother and father". Accordingly, Dr. Pina concluded:

> Banks learned to see himself as he thought the world saw him: as a ghastly, frightful, monstrous eyesore. He understandably went to great lengths to hide himself from public view throughout life.... His fears of rejection, confirmed by his classmates, only led to lower self esteem.

This psychological information, while possibly mitigating, does *not* present a reasonable probability that, had the jury been presented with it, it would have not assessed the death penalty.

38

In other words, in the light of the nature of the murder, Banks' intent soon thereafter to retrieve a weapon to be used in future armed robberies, and Banks' continued denial during the penalty phase that he committed the murder, there is not a reasonable probability that this evidence would have changed the outcome of the penalty phase. Accordingly, the district court erred in granting relief on this basis.

## b.

Next at issue is whether counsel was ineffective in failing to prepare penalty phase witnesses — in particular, Banks' parents — to testify.

### i.

Regarding deficient-performance, the State does not dispute the finding that Banks' counsel never attempted to prepare Banks' parents or any of the other defense witnesses offered during the penalty phase. We will assume deficient-performance.

### ii.

Regarding prejudice, Banks' father testified at the federal hearing that he had a drinking problem in his "younger days" and "used to get drunk every weekend". When asked "what would you have wanted to tell the jury about your son when they were going to go back and decide the sentence in this case", Banks' father responded: "I would've just [told] them to spare his life, because I know I raised him real nice. He couldn't [have done anything]

39

like that. I still say that". In an affidavit submitted in the state habeas proceedings, Banks' father stated that, when Banks was in elementary school, he tied him to a tree and "whipped him with a leather belt or strap" to discipline him for tricking other students out of their lunch money.

Banks' mother testified at the federal evidentiary hearing: Banks suffered from a skin disorder, as well as an inferiority complex; and her husband had a drinking problem while Banks was growing up. She testified during state habeas proceedings that her husband "would get drunk and he would get angry and holler at me".

Accordingly, at issue is whether, had Banks' counsel prepared Banks' parents to testify to the above described events (including: (1) the father's drinking; (2) the tying-whipping incident; and (3) the skin disorder), there is a reasonable probability the jury would not have assessed the death penalty. There is not a reasonable probability that, had the jury been presented with this information, it would not have assessed the death penalty. Therefore, the district court erred in granting relief on this basis.

As for the failure to prepare other penalty phase witnesses, the district court pointed to Kelly's being intoxicated on the morning he testified at Banks' trial and Banks' counsel's "speaking with Kelly for no more than one minute prior to testifying". *Banks-USDC*, at 22. The district court did not specify, nor does

40

Banks, what Kelly's testimony would have been had counsel prepared him. (In fact, Kelly's testimony was quite helpful to Banks; it impeached Farr's testimony concerning his attempts to illegally obtain prescription drugs.) Likewise, for his other penalty phase witnesses, Banks does not state what their testimony would have been had they been prepared. Accordingly, there is not a reasonable probability that, had counsel prepared them, the jury would not have sentenced Banks to death. Again, the district court erred in granting relief on this basis.

### c.

Next at issue is whether Banks' counsel was ineffective for failing to interview Vetrano Jefferson.

### i.

Concerning deficient-performance, the State does not dispute that Banks' counsel never interviewed Jefferson, one of only two penalty phase witnesses offered by the State. This failure falls below an objective standard of reasonableness. Counsel's performance was deficient.

### ii.

Again, in holding there was prejudice, the district court determined that, based on Jefferson's testimony at the evidentiary hearing, had Banks' counsel interviewed him, counsel "would have known that Jefferson, not Banks, was the *aggressor* in the fight between the two men.... The trial testimony of Jefferson ... left

41

the clear impression that Banks was the aggressor". **Banks-USDC**, at 23 (emphasis added). The State maintains: that Jefferson's testimony at the federal hearing is unexhausted; and that, alternatively, no prejudice resulted from the failure to interview.

(a)

The State asserts, and Banks does not dispute, that Vetrano Jefferson's post-trial testimony was never presented during the state habeas proceedings. (The State points out that the unsigned affidavit of Demetra Jefferson, (Vetrano Jefferson's sister and the mother of Banks' children) was presented during those proceedings. The district court apparently did not rely on that affidavit, and Banks does not contend that we should consider it in determining exhaustion *vel non*.)

Banks does not address exhaustion, much less show cause for why, in the state proceedings, he did not present Jefferson's current version of the events. Accordingly, his testimony is unexhausted; without it, Banks has not shown a reasonable probability that the outcome of the penalty phase would have been different, as there is no evidence to contradict Jefferson's trial testimony.

(b)

Even assuming exhaustion, Banks has not shown prejudice. At the penalty phase, Banks *admitted* he hit Jefferson with a gun and *threatened to kill him*.

42

Although, at trial, Jefferson testified that Banks did so, he gave no background regarding the altercation.  Jefferson provided that aspect at the federal hearing:

> I was drunk one day I came over and I was threatening my sister and he [Banks] defended her.  And when he told me to leave her alone, I told him I'll whoop his ass.  So we got into a fight.  And he got a gun and hit me in the face with it.

Jefferson testified that he started the fight.

The only difference between Jefferson's trial and federal hearing testimony is his stating Banks hit and threatened to kill him *in response to* his "threatening" his (Jefferson's) sister and telling Banks that he would "whoop his ass".  Thus, at issue is whether, based on this information, there is a reasonable probability the jury would not have answered the future dangerousness issue as it did.

Needless to say, Banks' *assaulting and threatening to kill Jefferson* is far from a proportional response to verbal threats of a non-lethal nature.  Based on Banks' violent response, coupled with Farr's testimony about Banks' post-murder intent to commit, or at least assist in, armed robberies, had the jury been presented with Jefferson's federal testimony, there is not a reasonable probability it would not have found future dangerousness. Accordingly, the district court erred in granting relief on this basis.

3.

43

As stated, relief should not have been granted on the basis of either ineffective-assistance or **Brady** error.  But, the magistrate judge seems to have grounded her recommendations with respect to both claims on cumulative error.

For the **Brady** claim, the magistrate judge recommended that the withheld information was material because

> the State's failure to disclose Farr's informant status, *coupled with trial counsel's dismal performance during the punishment phase*, undermined the reliability of the jury's verdict regarding punishment.  There is a reasonable probability that[,] *but for the foregoing*, the results of the punishment phase of the trial would have been different.

**Banks-USDC**, at 44 (emphasis added).

For the ineffective-assistance claim, regarding prejudice, the magistrate judge stated:

> This is not a case where the evidence presented by the State compels the conclusion that the specific evidence offered by Banks would not have made any difference in the outcome with respect to punishment.  There is a reasonable probability that[,] but for the errors and omissions of trial counsel at the punishment phase, *combined with the State's failure to disclose Farr as a paid informant*, the outcome of Banks' punishment phase would have been different.

**Banks-USDC**, at 24-25 (emphasis added).

The State objected to the report and recommendation on the basis that the cumulative error doctrine had been improperly invoked.  The district judge overruled the objection, holding that

44

the magistrate judge "separately considered and analyzed" the **Brady** and ineffective-assistance claims. **Banks-USDCII**, at 5. The district judge also overruled the objection on the basis that the two claims are interrelated, because Banks "contend[ed] that the State failed to produce, and his counsel, due to inadequate preparation, contrary to **Strickland**, failed to discover, substantial evidence regarding Farr's status". **Id**. Ultimately, the district judge noted that

> federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors so infected the entire trial that the resulting conviction violates due process.

**Id**. at 5-6 (quoting **Derden v. McNeel**, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 960 (1993)).

The magistrate judge did separately address the claims; but, each holding included the other as the basis of materiality or prejudice. The district judge was also incorrect that the claims were interrelated. In discussing ineffective-assistance, the magistrate judge stated:

> The State had a clear duty to correct Farr's untruthful testimony and failed to do so. *While trial counsel cannot be faulted for failing to object on this basis*, Farr's inaccurate testimony *compounded* the otherwise inadequate efforts of trial counsel during the punishment phase of the trial.

45

***Banks-USDC***, at 24 (emphasis added).  Although this statement attempts to link the two claims through cumulative error, it is not a conclusion that the ***Brady*** claim is related to deficient-performance.

Instead, it is the opposite.  In fact, in his brief, Banks makes clear he does not claim counsel was ineffective regarding the ***Brady*** claim: "[Trial counsel's] failure to impeach ... Farr's most damaging sentencing testimony ... cannot be laid at his feet".  Accordingly, contrary to the district court's holding that the claimed errors were related, the magistrate judge's recommendation was instead based upon cumulative error.

a.

Banks, however, did not claim cumulative error in his federal petition, with the exception of asserting that the "cumulative effect of the *prosecutors*' multifarious violations ... [denied him] a fundamentally fair trial".  (Emphasis added.)  Furthermore, he did not claim cumulative error in any of his three state petitions.  Accordingly the district court's cumulative error holding is based on an unexhausted claim.

b.

Assuming this claim is exhausted *and* was raised in the district court, the cumulative error holding fails on the merits.

Such error is predicated upon the theory that, although certain errors, considered individually, do not mandate relief,

46

those errors, when considered in the aggregate, do. *See **United States v. Sepulveda***, 15 F.3d 1161, 1195-96 (5th Cir. 1993) ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect".), *cert. denied*, 512 U.S. 1223 (1994).

It goes without saying that, for there to be cumulative error, there must first be error. Likewise, where there is no error, there is nothing to cumulate. *See, e.g.*, ***Yohey v. Collins***, 985 F.2d 222, 229 (5th Cir. 1993). Banks has not established error either under ***Brady*** or for ineffective-assistance. Therefore, relief cannot be based on cumulative error.

## B.

Notwithstanding that Banks filed pre-AEDPA for federal relief, he must obtain a COA, *pursuant to AEDPA*, in order to appeal a denied claim. *See **Green v. Johnson***, 116 F.3d 1115, 1120 (5th Cir. 1997); 28 U.S.C. § 2253(c)(1)(A). To receive a COA, he must make "a *substantial* showing of the denial of a constitutional right". 28 U.S.C. § 2253(c)(2) (emphasis added); *see also **Barefoot v. Estelle***, 463 U.S. 880, 893 (1983). He must demonstrate: the issues are subject to debate among reasonable jurists; or a court could resolve the issues in a different manner; or the questions presented are worthy of encouragement to proceed further. ***Slack v. McDaniel***, 529 U.S. 473, 483 (2000); ***Estelle***, 463 U.S. at 893 n.4.

For claims denied on *constitutional grounds*, Banks must "demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong". ***Slack***, 529 U.S. at 484. For those denied on *procedural grounds*, Banks must show "jurists of reason would find it debatable whether the petition states a *valid claim* of the denial of a constitutional right *and* that jurists of reason would find it debatable whether the district court was correct in its *procedural* ruling". ***Id.*** (emphasis added).

The claims for which he seeks a COA are: ***Brady***; ineffective-assistance at the guilt phase; ***Swain***; and sufficiency of the evidence.

1.

Banks' two ***Brady*** claims concern Cook: suppression of the earlier-described transcript (the 74-page transcript of the prosecution's pretrial, September 1980 interview of Cook (as opposed to his April 1980 statement)); and suppression of the earlier-described alleged deal for his testimony.

a.

The district court *refused to consider* the ***Brady*** claim concerning the transcript. The State maintains Banks never raised this issue in his petition; instead, he included the allegations in his proposed federal findings and conclusions, in his objection to the report and recommendation, and in his Rule 59 motion. That

48

motion to amend the judgment to discuss this claim was denied. Such denial is reviewed for an abuse of discretion. *Martinez v. Johnson*, 104 F.3d 769, 771 & n.3 (5th Cir.), *cert. denied*, 522 U.S. 875 (1997). Consequently, Banks must show jurists of reason would find it debatable whether the court abused its discretion.

Banks insists he pleaded the issue sufficiently by stating prosecutors "knowingly failed to turn over exculpatory evidence as required by *Brady*", mentioning Cook and Farr in that same paragraph. Further, Banks contends the State acknowledged *Brady* materials include impeachment evidence.

The State responds that the *Brady* claim in Banks' petition focused entirely on suppression of evidence concerning another murder suspect; linking "Cook to Robert Farr and to Texarkana generally"; revealing Farr's status as a police informant; and exposing Cook's motivation to testify favorably for the State to avoid prosecution on the unrelated arson charge that could have resulted in his receiving a life sentence (this different *Brady* claim is discussed *infra*). The State further asserts Banks should have sought leave to amend his petition under Federal Rule of Civil Procedure 15 because issues first raised in objections to a report and recommendation are not properly before the district court. *See United States v. Armstrong*, 951 F.2d 626, 630 (5th Cir. 1992); *United States v. Colon-Padilla*, 770 F.2d 1328, 1334 n.6 (5th Cir.

49

1985); *see also* **United States v. Saenz**, 282 F.3d 354, 356 (5th Cir. 2002) (Rule 15 appropriate for amending habeas petition).

Banks contends, however, that discovery and declarations from Cook and Farr demonstrated their extensive discussions with the prosecutors, leading to the production of the transcript. Following this production, the magistrate judge ruled that one issue for which evidence would be received concerned, *inter alia*, the State's "withholding exculpatory and impeachment evidence concerning at least two important witnesses — Charles Cook and Robert Farr".

The transcript was introduced at the federal hearing to establish the **Brady** claim of suppression of material impeachment evidence. Instead of objecting because Banks either was expanding his due process claim or failed to exhaust his claims in state court, the State, according to Banks, signaled to the court in pre-trial submissions that it intended to utilize the transcript and to call Bowie County ADA Elliot and Deputy Huff to defend against Banks' due process claim.

Accordingly, Banks contends Rule 15(b) applies: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings". FED. R. CIV. P. 15(b). "[O]nce issues are presented and argued without objection by opposing counsel, such issues are tried by implied consent of the parties

50

and are treated as if they had been raised in the pleadings".
*Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 389 (5th Cir. 1984); *see also* *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (5th Cir. 1982)("The test of consent is whether the opposing party had a fair opportunity to defend and whether he could have presented additional evidence....").

Because of the discovery order, the discussion of the issue at the federal hearing, and Banks' cross-examination of the State's witnesses, Banks maintains the State had sufficient notice that suppression of the transcript was included within the *Brady* claim. Therefore, Banks asserts this claim was before the district court. *See* *Mongrue v. Monsanto Co.*, 249 F.3d 422, 427-28 (5th Cir. 2001).

The State counters: a federal evidentiary hearing is not a trial for Rule 15 purposes; it opposed Banks' hearing request, maintaining, pursuant to *Keeney*, 504 U.S. at 5-6 (if petitioner fails to develop claim in state court, must show cause and prejudice to receive federal evidentiary hearing), he was not entitled to one; no authority exists to suggest an evidentiary hearing waives exhaustion or procedural default defenses or the requirement that Banks must amend his petition to assert additional claims; and Banks' questioning witnesses at an evidentiary hearing does not substitute for his not amending his petition.

On this issue, the district court correctly determined:  in his petition, Banks did not state a *Brady* claim concerning the

51

transcript, because Banks did not learn of it until *three years after* it was filed; Banks should have sought leave to amend his petition to add this claim; and issues first raised in objections to a report and recommendation are not properly before the district court. *See **Armstrong***, 951 F.2d at 630. Further, Banks has not pointed to any authority supporting his contention that, for Rule 15 purposes, an evidentiary hearing equates with a trial. Banks has failed to demonstrate "jurists of reason would find it debatable whether the district court was correct" in denying his Rule 59 motion. ***Slack***, 529 U.S. at 484.

b.

Also denied was the ***Brady*** claim of suppression of assurances to Cook that, in exchange for favorable testimony, prosecutors would arrange for dismissal of the pending arson charge. Banks asserts: the charge was discussed by Deputy Huff and Cook; the Deputy informed Cook of the filing of habitual offender papers (life imprisonment); prior to trial, Cook was provided daily conjugal visits with his wife; and the charge was dismissed the day after Cook's testimony because ADA Elliot and Deputy Huff traveled to Dallas with Cook, where Elliot spoke to the prosecutor there.

Banks bases error on the district court's: relying on "misleading evidence" submitted in state court proceedings; and finding the Dallas County prosecutor stated by affidavit there was no prearranged plea bargain. Banks contends, and the State

52

concedes, that the affidavit shows the prosecutor was involved in an unrelated forgery prosecution against Cook more than a year after Banks' trial. Banks contends the evidence sufficiently shows the denial of a constitutional right, citing *Giglio* (suppression of a deal with prosecution's witness).

The State counters that the evidence submitted during the state habeas proceedings was not misleading. In those proceedings, in its response to this claim, the State provided affidavits from Deputy Huff, ADA Elliot, and former Dallas County ADA Byrne.

Byrne's 12 May 1992 affidavit states in relevant part: he was a Dallas County ADA in *June 1981* (eight months after Banks' trial); he was the prosecuting attorney in *State of Texas v. Charles Edward Cook*, No. F81-2140-P; and he had no recollection of any deal in exchange for Cook's testimony in Banks' trial. Banks explained in his state court reply that Byrne was the prosecutor for the forgery conviction following Banks' trial. The state habeas court found "no agreement between the State and ... Cook". As noted, state court factual findings are entitled to a presumption of correctness. *See Green*, 116 F.3d at 1120 (applying pre-AEDPA law); 28 U.S.C. § 2254(d) (1994).

Further, the State maintains the district court's ruling was not based solely on Byrne's affidavit but considered all the evidence: the arson occurred on 7 May 1980, 13 days after Cook's April 1980 statement; Bowie County District Attorney Raffaelli

53

stated at trial no deal had been made in exchange for Cook's testimony; ADA Elliott denied any discussions with Cook prior to Banks' trial but, following it, discussed Cook's favorable testimony with a Dallas County prosecutor when he (Elliott) returned Cook there; the discussion with that prosecutor was not a reward for Cook, but was done because Elliot wanted that prosecutor to know Cook had cooperated with law enforcement and hoped the same would be done for him in cases he was handling.

The magistrate judge recommended that Cook's testimony at the federal hearing provided Banks' only evidence of a deal between the State and Cook or of threats to compel his testimony. Citing *Spence v. Johnson*, 80 F.3d 989 (5th Cir.), *cert. denied*, 519 U.S. 1012 (1996), the magistrate judge recommended denying relief on this claim because "the evidence and testimony presented by Cook in this matter [are] *not* credible". (Emphasis added.) Needless to say, testimony from recanting witnesses is properly viewed with suspicion, because it: upsets the finality of convictions; is often unreliable, given suspect motives; and often serves to impeach cumulative evidence, rather than undermine the accuracy of the conviction. *Dobbert v. Wainwright*, 468 U.S. 1231 (1984) (Brennan, J., dissenting); *May v. Collins*, 955 F.2d 299, 314 (5th Cir.), *cert. denied*, 504 U.S. 901 (1992); see *also* *Olson v. United States*, 989 F.2d 229, 231 (7th Cir.), *cert. denied*, 510 U.S. 895

54

(1993); *United States v. Provost*, 969 F.2d 617, 620 (8th Cir. 1992), *cert. denied*, 506 U.S. 1056 (1993).

Banks disagrees with the district court's credibility determinations. It goes without saying that we "accept magistrate judge's findings [adopted by the district judge] unless they are clearly erroneous". *United States v. Breeland*, 53 F.3d 100, 103 (5th Cir. 1995) ("Clear error is *especially rigorous* when applied to *credibility determinations* because the trier of fact has seen and judged the witnesses." (Emphasis added; internal quotation marks omitted.)).

The findings with respect to Cook and ADA Elliot were "plausible in light of the record viewed in its entirety". *Id.* (internal quotation marks omitted). And, again, the state habeas court's identical finding is entitled to a presumption of correctness. *See Green*, 116 F.3d at 1120. Banks has failed to demonstrate the district court's assessment of this *Brady* claim was debatable or wrong. *See Slack*, 529 U.S. at 484.

2.

For the COA requested for ineffective-assistance at the guilt phase, *see Strickland*, 466 U.S. at 668, Banks claims failure: to investigate; to prepare for trial; and to effectively cross-examine witnesses. (In addition, in the heading of one section of his brief here, Banks states counsel was ineffective for failing "To Object to Prosecutor's Repeated Vouching for [Farr's and Cook's]

55

Credibility". Because of the contemporaneous objection rule, this failure-to-object prevented Banks from raising a prosecutorial misconduct claim. *See* **Jackson**, 194 F.3d at 652. But, because counsel was unaware of Farr's paid-informant status and Cook's prior statements, there was no deficient-performance in this regard. Further, this claim was never raised in district court and is not properly before us. *See, e.g.,* **Dowthitt v. Johnson,** 230 F.3d 733, 741 n.3 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001); **Puckett**, 176 F.3d at 814; **Hallmark**, 118 F.3d at 1079 n.3; **Yohey**, 985 F.2d at 226.)

Obviously, a reasonable attorney engages in "a reasonable amount of pretrial investigation", including interviewing potential witnesses and making an independent investigation of the facts and circumstances, **Bryant v. Scott**, 28 F.3d 1411, 1415 (5th Cir. 1994), and adequately and independently searching for available defense evidence. *See* **Moore v. Johnson**, 194 F.3d 586, 608 (5th Cir. 1999) (lack of investigation into evidence in state's file and evidence used to counter defendant's alibi defense).

Banks also contends an ineffective-assistance claim involves consideration of the strength of the State's case. Restated, a weak case for the State means counsel's ineffective performance has a much greater impact on the trial's outcome. For example, in **Bryant**, the court noted that the lack of physical evidence connecting the defendant to the crime scene increased the

56

importance of pre-trial investigation of eyewitnesses; something a reasonable lawyer would have realized and acted upon. 28 F.3d at 1418.

Banks contends that, in the light of the evidence at the examining hearing four months before trial, his counsel should have investigated the following: Banks' claim he hitchhiked to Dallas, which contrasted with the State's contention he drove the victim's vehicle there; the victim's time of death; and Cook's credibility.

First, the State's theory was that, after shooting the victim, Banks drove his automobile to Dallas. Investigating the identity of the individual who (according to Banks) allegedly picked Banks up and drove him to Dallas or finding ways to attack the State's view that Banks drove an automobile with serious electrical problems to Dallas would have been important to Banks' defense.

Second, concerning the claimed time of death, Banks arrived in Dallas by 8:30 a.m. on Saturday. The victim was killed approximately 180 miles from Dallas. Therefore, evidence that the victim was shot *after* 5:00 a.m. on Saturday would have been exculpatory.

And third, Cook was the only witness to testify that Banks made incriminating statements. Obviously, Cook's credibility and the reliability of his account of the events of the 12 April weekend were critical.

Additionally, Banks contends that, other than his counsel's (Cooksey's) speaking to witnesses identified by Banks' common-law wife a few days after Cooksey was retained, Cooksey did little else. He filed several pretrial motions but did not ask to be heard pre-trial. Further, his remarks on the record demonstrate his lack of preparation: on the first day of jury selection, "I'm not in possession of any information on any of the State's witnesses"; after jury selection, prior to further proceedings, "I don't have [a list of prosecution witnesses' prior convictions] yet and I can not effectively cross-examine these people without it"; and during those subsequent proceedings, I've "never been to the [crime scene] ... I don't even know where it is" and "I haven't seen the ballistics report".

Banks cites other claimed ineffective-assistance. During trial, in cross-examining two persons who were with the victim on Friday night, 11 April, Hicks and Bungardt (he didn't cross-examine the latter), Cooksey failed to develop the full extent of the problems with the victim's automobile. Counsel made no effort to attack Fisher's recollection of two gunshots as unreliable because of Fisher's groggy state, with Fisher's testimony being the State's only evidence of time of death. (In closing arguments, Cooksey stated: Fisher "certainly told you [the jury] the truth, without a doubt".) He did not cross-examine Deputy Huff. And, his cross-

examination of the medical examiner pertained only on the amount of alcohol consumed by the victim prior to his death.

Banks contends: had Cooksey reasonably prepared for trial, he could have demonstrated the autopsy report and crime scene evidence suggested time of death was 12 to 24 hours after Fisher reported hearing the gunshots. In support, Banks notes: rigor mortis appears very soon after death, *usually* rendering the body stiff within 12 to 24 hours and *usually waning about 36 hours following death*; nevertheless, Deputy Huff and Dr. DiMaio observed full rigor mortis in the body, even though Deputy Huff did not observe the victim until approximately 54 hours after Fisher heard the loud noises and Dr. DiMaio observed him roughly 24 hours after Deputy Huff. Banks also notes: 72 hours after death, DiMaio should have observed a drying of the lips, a graying discoloration of the lower abdomen, and clouding of the corneas; however, although DiMaio looked for these symptoms, he found none.

Likewise, Banks contends reasonable preparation would have resulted in: having a mechanic testify about the unreliability of the victim's automobile; exposing the difference between Hicks' and Bungardt's testimony about a defective car and Cook's testimony never mentioning any problems with it (in the state habeas proceedings, the court concluded it was highly unlikely the vehicle described by Hicks and Bungardt could have been driven to Dallas

59

without major repair work); and adequately cross-examining arguably non-hostile prosecution witnesses.

Accordingly, Banks contends he has shown deficient-performance and prejudice considering his counsel's approach to the entire trial, including the witnesses and readily available evidence that could have provided the jury with reasonable doubt.

In countering these sweeping assertions, the State reminds that, on the merits, Banks must show "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment". *Strickland*, 466 U.S. at 687; *see also Bell v. Cone*, 122 S. Ct. 1843 (2002); *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997). Judicial scrutiny must be "highly deferential". *Strickland*, 466 U.S. at 689; *see also Bell,* 122 S. Ct. at 1852. Again, for prejudice, Banks must (on the merits) demonstrate to a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Williams v. Taylor*, 529 U.S. 362, 391 (2000) (citing *Strickland*, 466 U.S. at 694). (Of course, to obtain a COA, he must make only a substantial showing of ineffective assistance.)

Concerning time of death, the State contends that, at the evidentiary hearing, Banks' expert conceded (as discussed *supra*) it was possible the victim was killed at the time the State theorized. Accordingly, the State asserts Banks failed to prove the result of the trial would have been different.

60

Concerning the victim's automobile, the State contends Banks failed to sufficiently plead these claims with specificity and to show what evidence such investigations would have revealed. Banks must state with specificity what the investigation would have revealed and how it would have altered the outcome. *See **United States v. Green***, 882 F.2d 999, 1003 (5th Cir. 1989).

The State contends Banks merely makes conclusory and speculative allegations which do not sufficiently raise constitutional issues to justify relief. *See **Blackledge v. Allison***, 431 U.S. 63, 74 (1977); ***Barnard v. Collins***, 958 F.2d 634, 643 n.11 (5th Cir. 1992), *cert. denied*, 506 U.S. 1057 (1993); ***Ross v. Estelle***, 694 F.2d 1008, 1012 (5th Cir. 1983). The State maintains the district court also implicitly rejected these claims because they were improperly raised in Banks' proposed findings and conclusions rather than in his habeas claim; and, considering Banks' conclusory claims, this implicit rejection was not an abuse of discretion. *See **United States v. Cervantes***, 132 F.3d 1106, 1111 (5th Cir. 1998) (refusal to consider claims raised by unauthorized amendments reviewed for abuse of discretion) (citing ***United States v. Armstrong***, 951 F.2d 626, 630 (5th Cir. 1992); ***Barksdale v. King***, 699 F.2d 744, 747 (5th Cir. 1983)).

For purposes of obtaining a COA, Banks does not show reasonable jurists would find it debatable whether Cooksey's performance was deficient. Cooksey did not personally investigate

61

certain aspects of the case; but, his investigator did conduct an investigation, which included visiting the crime scene and interviewing witnesses. Further, although Banks can speculate about Cooksey's cross-examination techniques, Cooksey has never been asked to explain these aspects of his trial strategy (even though, in state habeas proceedings, he did provide testimony concerning Banks' *Swain* claim).

Moreover, for purposes of obtaining a COA, and assuming deficient-performance in investigation, trial preparation, and cross-examination, Banks has failed to show, for the prejudice prong, that "reasonable jurists would find the district court's assessment ... debatable or wrong". *Slack*, 529 U.S. at 484. Banks has not made a substantial showing that the trial-result would be different. His expert conceded the time of death could have been as the State suggested; Banks does not show that the alleged errors would have changed the jury's consideration of Cook's testimony concerning Banks' confession to him; and Banks' allegations concerning problems with the victim's automobile are too conclusory and do not show how that evidence could have provided reasonable doubt.

3.

Near the end of jury selection, Banks passed Cooksey a note: "[W]e need[] black[s]". Cooksey responded: "State will strike all blacks". Indeed, the State used four peremptory strikes to remove

62

all qualified blacks from the jury pool.  Accordingly, Banks presents a *Swain* claim.

As noted, concerning this claim, *no* contemporaneous objection was made at trial.  Banks contends it is not procedurally barred by counsel's failure to raise it at trial because it was rejected on the merits in state habeas proceedings and because the State waived the defense by not raising it in a timely manner and by electing to resolve the claim on the merits.  Further, Banks asserts:  we should not defer to the state court's ruling; and he has made a *substantial showing* of the denial of a constitutional right, namely that Bowie County prosecutors engaged in the systematic exclusion of black jurors continuing through Banks' trial.

In his first state habeas application, Banks pleaded a *Swain* claim.  The State did not claim untimeliness; and the court recommended its denial on the merits, finding "no systematic exclusion by the State of any black veniremen or jurors in contravention of [Banks'] rights".  On appeal, the State again made no waiver or procedural default assertion; the claim was denied based on the trial court's findings.  *Ex Parte Banks,* No. 13,568-01 (Tex. Crim. App. 1984) (unpublished).

In his third state application, Banks again raised his *Swain* claim; the State urged denial on the merits; and the trial court recommended denial.  On appeal, the State claimed, *for the first*

63

*time*, that Banks defaulted his ***Swain*** claim because Cooksey failed, at trial, to make a contemporaneous objection.

On remand to the trial court for an evidentiary hearing on, *inter alia*, the ***Swain*** claim, that court found Cooksey failed to raise the claim because he did not believe the prosecutors' practices showed a ***Swain*** violation, and consequently, the claim was procedurally barred. In addition, the court reached the merits of the claim. As discussed *supra*, although it concluded the evidence showed a *prima facie* case of systematic exclusion, it found the peremptorily-struck four black jurors were removed for non-racial reasons. On appeal, the claim was denied for the reasons given by the trial court. ***Ex Parte Banks,*** No. 13,568-03 (Tex. Crim App. 1996) (unpublished).

Banks contends the district court incorrectly found Texas' contemporaneous objection rule is an adequate and independent ground for procedural default, claiming the rule was not "firmly established and regularly followed" at the time of the default. ***Ford v. Georgia***, 498 U.S. 411, 423-24 (1991) (quoting ***James v. Kentucky***, 466 U.S. 341, 348 (1984)). The inquiry is whether the rule "is strictly or regularly applied evenhandedly to the vast majority of similar claims", ***Amos v. Scott***, 61 F.3d 333, 339 (5th Cir.) (emphasis removed), *cert. denied*, 516 U.S. 1005 (1995), or "identical claims", ***id.*** at 343; *see also* ***Finley v. Johnson***, 243

64

F.3d 215, 218 (5th Cir. 2001); *Martin v. Maxey*, 98 F.3d 844, 847-48 (5th Cir. 1996).

Banks asserts that, although Texas courts regularly apply the contemporaneous objection rule to other types of claims, they have not strictly and regularly applied it to *Swain* claims. *See, e.g., Hogue v. Johnson*, 131 F.3d 466 (5th Cir. 1997) (applying rule to unobjected-to introduction of prior convictions), *cert. denied*, 523 U.S. 1014 (1998); *Clark v. Collins*, 19 F.3d 959 (5th Cir.) (*Batson v. Kentucky,* 476 U.S. 79 (1986), claim), *cert. denied*, 513 U.S. 1036 (1994); *Harris v. Collins*, 990 F.2d 185, 187 (5th Cir.) (*Batson* claim), *cert. denied*, 509 U.S. 933 (1993). Banks contends the court in *Ex Parte Haliburton*, 755 S.W.2d 131, 135 n.5 (Tex. Crim. App. 1988), reached the merits of a *Swain* claim even though the defendant failed to show he timely objected at trial; and, in *Chambers v. State*, 568 S.W.2d 313 (Tex. Crim. App. 1978), *cert. denied*, 440 U.S. 928 (1979), although it was unclear the issue was preserved because it was not raised in the new trial motion, the court addressed the merits of a claim that blacks were systematically excluded from jury service. Banks also contends a *Batson* claim is not a "similar claim" because *Batson* claims solely consider a prosecutor's use of peremptory strikes in individual trials and depend on contemporaneous credibility determinations to explain a discriminatory pattern of strikes; on the other hand,

65

*Swain* claims look at prosecutors' historical, systematic, and continued discriminatory jury selection practices.

Banks also contends:  the Supreme Court has never held its procedural default jurisprudence applies to *Swain* claims; they are unlike any other a defendant might raise at trial because the claim requires collection of extensive historical material which is hard to collect prior to trial; and, indeed, the reason the Court rejected *Swain* for *Batson* was because the facts necessary to support a *Swain* claim were not reasonably available at trial.

The State correctly contends federal habeas relief is precluded when the last state court judgment relies upon an independent and adequate state procedural bar.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991); *Harris v. Reed*, 489 U.S. 255, 264 & n.10 (1989) (even if the state court reaches the merits of the claim); *Buxton v. Collins*, 925 F.2d 816, 821 (5th Cir.), *cert. denied*, 498 U.S. 1128 (1991).

Banks' contention that Texas does not firmly apply the contemporaneous objection rule to *Swain* claims is undermined by case law.  *See Trevino v. Texas*, 503 U.S. 562, 566-67 (1992) (failure to challenge in some form the exclusion of black jurors implicates contemporaneous objection rule); *Teague v. Lane*, 489 U.S. 288, 297 (1989).  Texas courts regularly applied the rule in the pre-*Batson*, *Swain* era.  *Williams v. State*, 773 S.W.2d 525, 534-

66

35 (Tex. Crim. App. 1988), *cert. denied*, 493 U.S. 900 (1989) *Mathews v. State*, 768 S.W.2d 731, 733 (Tex. Crim. App. 1989).

In response to the cases cited by Banks, the State contends *Chambers* assumed, without deciding, that the issue was properly before it, *see* 568 S.W.2d at 328, but stated the failure to object waives the right and bars consideration on appeal. *Id.* at 319. Also, *Ex Parte Halliburton* merely stated: "[W]e could not say prior to applicant's evidentiary hearing that he needed to object at trial in order to preserve *Swain* error". 755 S.W.2d at 135 n.5. Further, "an occasional act of grace by the Texas court in entertaining the merits of [a] claim that might have been viewed as waived by procedural default" does not constitute failure to regularly apply the rule. *Hogue*, 131 F.3d at 487 (internal quotation marks omitted); *Bass v. Estelle*, 705 F.2d 121, 122-23 (5th Cir.), *cert. denied*, 464 U.S. 865 (1983).

Additionally, the State asserts the contemporaneous objection rule is applied to substantially similar claims because *Batson* merely changed the quantum of proof rather than the type claim asserted. *See, e.g., Andrews v. Collins*, 21 F.3d 612, 621 (5th Cir. 1994) (*Batson* claim), *cert. denied*, 513 U.S. 1114 (1995); *Harris v. Collins*, 990 F.2d 185, 187 (5th Cir.) (same), *cert. denied*, 509 U.S. 933 (1993); *Jones v. Butler*, 864 F.2d 348, 369-70 (5th Cir. 1988) (pre-*Batson*, *Swain* provided a means to raise a

*Batson*-type claim.), *cert. denied*, 490 U.S. 1075 (1989); *see also* *Wright v. Hopper*, 169 F.3d 695, 709 (11th Cir.) (*Swain* claim procedurally defaulted for failure to object), *cert. denied*, 528 U.S. 934 (1999).

Finally, Banks contends the State waived the procedural default defense by not timely raising it. (Banks also asserts the State's failure to raise this defense shows the contemporaneous objection rule is not a firmly established rule for *Swain* claims.) "[P]rocedural default is normally a 'defense' that the State is 'obligated to raise' and 'preserv[e]' if it is not to 'lose the right to assert the defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166 (1996)); *see also* *Engle v. Isaac*, 456 U.S. 107, 124 n.26 (1982) ("[A] State's plea of default may come too late to bar consideration of the prisoner's constitutional claim".). In the exhaustion context, the Supreme Court rejected a rule allowing, or even encouraging, "the State to seek a favorable ruling on the merits in the district court while holding the exhaustion defense ... for use on appeal [because the rule might] prolong the prisoner's confinement for no other reason than the State's postponement of the [] defense...." *Granberry v. Greer*, 481 U.S. 129, 132 (1987).

A State waives a procedural bar defense by failing timely to raise it. *Fisher v. Texas*, 169 F.3d 295 (5th Cir. 1999)(waiver for

68

failure to raise the defense in district court); *Emery v. Johnson*, 139 F.3d 191, 195 n.4 (5th Cir. 1997) (waiver for failure "to plead procedural bar in the district court") (citing *United States v. Marcello*, 876 F.2d 1147, 1153 (5th Cir. 1989)), *cert. denied*, 525 U.S. 969 (1989); *see also Cooper v. State*, 791 S.W.2d 80 (Tex. Crim. App. 1990) (en banc) (state's obligation to raise the issue before the appellate court); *Tallant v. State*, 742 S.W.2d 292, 294 (Tex. Crim. App. 1987) (*en banc*) ("[T]he State must call to the attention of the court of appeals in orderly and timely fashion that an alleged error was not preserved."). On the other hand, waiver is averted if the State raises the default "*at any point* in the district court proceedings". *Wiggins v. Procunier*, 753 F.2d 1318, 1321 (5th Cir. 1985) (emphasis added). It is undisputed the State then raised the issue; therefore, in this regard, Banks' assertion fails.

Assuming he defaulted on his *Swain* claim, Banks contends: he has shown sufficient cause and prejudice. *See, e.g., Harris v. Reed*, 489 U.S. 255 (1989). He maintains ineffectiveness of counsel, *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986), or conflict of interest, *Cuyler v. Sullivan*, 446 U.S. 335 (1980), provide sufficient cause. Banks contends his trial counsel was ineffective for: failing to object; failing to conduct a reasonable investigation; and misunderstanding his burden of proof.

69

Failure to make a contemporaneous *Swain* objection may constitute deficient-performance, providing cause for procedural default in the light of the evidence supporting the *Swain* claim. *Jackson v. Herring*, 42 F.3d 1350, 1358 (11th Cir.), *cert. dismissed*, 515 U.S. 1189 (1995). In the state habeas proceedings, Cooksey testified he "probably would have" raised a *Swain* objection had he possessed historical evidence of a practice of systematic exclusion of black venire members and would have raised the claim if there had been even a "scintilla of success". Banks contends Cooksey, as the former District Attorney, was uniquely aware of the practice.

During the last four years of Cooksey's tenure as District Attorney, 94% of black venire members were struck compared with approximately 20% of whites. In this regard, at the state evidentiary hearing, Cooksey conceded the District Attorney's striking practice, including at Banks' trial, was racially disproportionate – over 92% of black venire members struck peremptorily compared to less than 20% of whites. Given Cooksey's knowledge, Banks contends Cooksey's failure to object was not a reasonable tactical decision.

Banks further contends Cooksey failed to conduct a "reasonable investigation" into the viability of a *Swain* claim. *Strickland*, 466 U.S. at 691. The state habeas court found Cooksey: was aware of *Swain*; evaluated his chances for a successful challenge; and

70

concluded he could not prevail. On the other hand, it also found the statistics presented "a prima facie case" of exclusion. Banks contends: the record is devoid of any evidence of investigation into the merits of a *Swain* claim; and Cooksey's testimony was that he did not raise a *Swain* claim because, in an earlier case prosecuted by Raffaelli, he (Cooksey) noticed two blacks were on the jury, even though he conceded on cross-examination that *Swain* required an examination of the striking practice over a series of cases. Banks maintains these inconsistencies, coupled with counsel's assurance, during jury selection, that the "State will strike all blacks", suggests Cooksey's failure to investigate was not sound trial strategy and fell below "the range of competence demanded of attorneys in criminal cases". *Cook v. Lynaugh*, 821 F.2d 1072, 1078 (5th Cir. 1987) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 (1970)).

Again, counsel "must have a firm command of the facts of the case as well as the governing law before he can render reasonably effective assistance". *Ex Parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990). Cooksey had an erroneous view of the *Swain* burden of proof. He believed statistical proof was not useful under the circumstances; and that, beyond establishing a *prima facie* case, the defendant must prove the prosecutor's discriminatory intent. Establishing a *prima facie* case, however, shifts the burden to the State to rebut the presumption of

71

discrimination. *Willis v. Zant*, 720 F.2d 1212, 1220-21 (5th Cir. 1983), *cert. denied*, 467 U.S. 1256 (1984).

Because the failure to object resulted in an all-white jury, Banks contends Cooksey's deficient-performance prejudiced him. Systematic exclusion of blacks from petit juries slants the judicial process unfairly against black defendants. *See Hollis v. Davis*, 941 F.2d 1471, 1482 (11th Cir. 1991) ("[W]e would have greater confidence in the [result reached by a racially mixed jury], finding much less probability that racial bias had affected it".), *cert. denied*, 503 U.S. 938 (1992); *see also Cassell v. Texas*, 339 U.S. 282 (1950) (Jackson, J. dissenting).

The State responds: the state habeas court found Cooksey evaluated his chances of success and determined a *Swain* claim would have been frivolous; and, because Texas courts have repeatedly rejected *Swain* claims, *see Andrews*, 21 F.3d at 623; *Evans v. State*, 622 S.W.2d 866 (Tex. Crim. App. 1981), deciding to forgo the *Swain* claim was not constitutionally deficient, *see id.; Wiley v. Puckett*, 969 F.2d 86, 102 (5th Cir. 1992); *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990). Because Texas courts repeatedly reject *Swain* claims, the State also contends any objection would have been unsuccessful, which prevents Banks from demonstrating prejudice.

Also, Banks claims Cooksey had a conflict of interest because a *Swain* claim would implicate him in his prior role as District

72

Attorney. To warrant relief from procedural default, however, the conflict must have been actual, not merely speculative. *Barrientos v. United States*, 668 F.2d 838, 841 (5th Cir. 1982). Actual conflict exists when "a defense attorney owes duties to a party whose interests are adverse to those of the defendant". *Zuck v. Alabama*, 588 F.2d 436, 439 (5th Cir.), *cert. denied*, 444 U.S. 833 (1979); *see also United States v. Martinez*, 630 F.2d 361 (5th Cir. 1980) (previous representation of prosecution witness), *cert. denied*, 450 U.S. 922 (1981); *Stephens v. United States*, 595 F.2d 1066 (5th Cir. 1979) (concurrent representation of prosecution witness). Banks contends the conflict in this case was exposing a practice that Cooksey had engaged in for years.

The State responds that Banks has failed to show a conflict of interest under *Cuyler,* 446 U.S. at 348. *See Hernandez v. Johnson*, 108 F.3d 554, 559-60 (5th Cir.) (assuming without deciding the *Cuyler* standard applies when a former district attorney represents a defendant), *cert. denied*, 522 U.S. 984 (1997). Banks must show: trial counsel's situation was "inherently conducive to divided loyalties", *Perillo v. Johnson*, 205 F.3d 775, 801 (5th Cir. 2000) (internal quotation marks omitted); and counsel did not pursue the strategy because of the conflict, *Hernandez*, 108 F.3d at 560. Because mere conclusory allegations are insufficient, *Perillo*, 205 F.3d at 802, Banks has failed to show any evidence in the record that Cooksey failed to make the *Swain* objection because of his

73

former position. *See also* **Mickens v. Taylor**, 122 S. Ct. 1237 (2002).

For COA purposes, the **Swain** claim was procedurally defaulted. Texas courts regularly apply the contemporaneous objection rule to **Swain**, as well as to similar **Batson**, claims. As for cause and prejudice to overcome the default, although it may be that counsel was deficient in not contemporaneously raising this claim, Banks has failed to show prejudice sufficient to overcome the bar. In the light of the state court's finding of a *prima facie* **Swain** violation, the State proved that, for Banks' trial, no black venire member was excluded because of his or her race. Consequently, for his **Swain** claim, Banks fails to make a substantial showing of the denial of a constitutional right.

### 4.

Banks contends the evidence fails to establish future dangerousness beyond a reasonable doubt. **Jackson v. Virginia**, 443 U.S. 307 (1979). At trial, the State relied upon the underlying facts of the crime, Vetrano Jefferson's testimony of Banks' unprovoked assault with a pistol, and Farr's testimony that Banks sought to reclaim his pistol in Dallas in order to commit armed robbery and, if necessary, eliminate witnesses. Banks maintains evidence revealed in this appeal establishes: Jefferson's testimony as to who was the aggressor was misleading; Farr's testimony was

74

false; and, without their testimony, the evidence did not establish future dangerousness.

Although Banks contested sufficiency of the evidence in each of his three state habeas petitions, he did *not* do so on direct appeal. *The last state court judgment on this issue* (third state habeas proceeding) held his claim meritless and expressly and unambiguously applied a procedural bar:

> The evidence is sufficient to support an affirmative answer to the second [future dangerousness] special issue. *This claim is procedurally barred*. Sufficiency of evidence may *not* be raised in collateral attack. **Ex parte Brown**, 757 S.W.2d 367 (Tex. Crim. App. 1988); **Ex parte Williams**, 703 S.W.2d 6[74] (Tex. Crim. App. 1986).

*Ex Parte Banks*, No. 80-F-86-102-C (D. Ct. Bowie County 22 Feb. 1993) (unpublished)(emphasis added). The Court of Criminal Appeals summarily accepted the findings and conclusions. *See* **Ex Parte Banks**, No. 13,568-03 (Tex. Crim. App. 11 Jan. 1996) (unpublished).

Accordingly, the district court held the claim defaulted. *See* **Coleman**, 501 U.S. 739-30. As discussed *supra*, even if the state court reaches the merits of a claim, federal courts must honor an independent and adequate procedural bar. **Harris**, 489 U.S. at 264 n.10; **Corwin v. Johnson**, 150 F.3d 467, 473 (5th Cir.), *cert. denied*, 525 U.S. 1049 (1998). The state court's invocation of the bar must be clear and express; and the bar must be followed regularly by state courts and applied to a majority of identical or

75

similar claims.  *Finley*, 243 F.3d at 218; *Martin*, 98 F.3d at 847-48; *Amos*, 61 F.3d at 341.

Texas courts regularly apply this bar to claims raised for the first time on collateral review.  *See, e.g., **Ex parte Sanchez***, 918 S.W.2d 526, 527 (Tex. Crim. App. 1996).  And, as a bar to federal habeas review, our court has similarly acknowledged Texas courts' application of this bar.  *E.g., **Renz v. Scott***, 28 F.3d 431, 432 (5th Cir. 1994); *Clark v. State of Texas*, 788 F.2d 309, 310 (5th Cir. 1986).

Nevertheless, Banks asserts:  because "state courts repeatedly forgave [the failure to raise the claim on direct appeal] and reviewed the claim on its merits during [his] first and second [state] proceedings", the state court's default determination, *in his third habeas proceeding*, was actually a determination that the court would not again review the merits.  This contention ignores the clear language of the above-quoted last state court decision, applying the procedural bar.

Banks further submits that, even if the claim is defaulted, given the record before the court, a miscarriage of justice will occur in the absence of review.  *Calderon v. Thompson*, 523 U.S. 538 (1998); *Schlup v. Delo*, 513 U.S. 298 (1995).  According to Banks, at the federal evidentiary hearing:  Farr testified his penalty phase testimony was a misrepresentation, because Banks had no plans to commit further crimes; Vetrano Jefferson testified his trial

76

testimony was misleading, because he was the aggressor and Banks acted primarily to protect his pregnant common-law wife; and Banks' unrebutted time of death evidence made it unlikely he could have committed the crime. Banks contends the new evidence shows by clear and convincing evidence that, had the jury known of this evidence, he would not have been convicted or sentenced to death. *See* **Reasonover v. Washington**, 60 F. Supp. 2d 937 (E.D. Mo. 1999) (key witness testimony fabricated and another witness received sentencing leniency); **Richter v. Bartee**, 973 F. Supp. 1118 (D. Neb. 1997) (new evidence that complainant fabricated sexual assault).

As the State correctly observes, the miscarriage of justice exception is reserved for cases of factual innocence. *See* **Rodriguez v. Johnson**, 104 F.3d 694, 697 (5th Cir. 1997). The State contends: the testimony by Farr and Vetrano Jefferson had *nothing* to do with whether Banks murdered the victim; Banks failed to identify recanted testimony from Cook showing Banks' actual innocence; and Banks' expert admitted it was possible the victim was shot when Fisher reported hearing the loud noises.

For COA purposes, the last state court to address Banks' sufficiency claim found it procedurally barred; Banks has failed to show cause and prejudice to excuse that default; and the miscarriage of justice exception does not apply. In sum, Banks has not shown that jurists of reason would find it debatable that the district court was incorrect in ruling Banks defaulted this claim.

77

## III.

For the foregoing reasons, we **DENY** the COA requests; **REVERSE and DENY** the grant of habeas relief; and, therefore, **RENDER** judgment for Respondent.

*COA and HABEAS RELIEF DENIED; JUDGMENT REVERSED and RENDERED*